IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SAFE AUTO INSURANCE COMPANY,

    **Plaintiff and Counter Defendant,**

    v.

**STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY,**

    **Defendant and Counter Claimant.**

**Case No. 2:07-cv-1121**

**JUDGE EDMUND A. SARGUS, JR.**

**Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff's Motion for Summary

Judgment on Count I of the Complaint and Counts I–IV of Defendant's Counterclaims

(Document 40), Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims for a

Monetary Award (Document 41), Defendant's Motion for Summary Judgment (Document 43),

and Plaintiff's Motion to Strike the Report of Dr. Alexander Simonson and Hearsay Evidence

(Document 57). For the reasons that follow, the Court **DENIES** Plaintiff's Motion to Strike

(Document 57); **DENIES** the parties' motions for summary judgment on Plaintiff's Counts I and

II and Defendants' Counterclaims I–IV (Documents 40 and 43), and **DENIES** without prejudice

Plaintiff's Motion for Summary Judgment on Defendant's Monetary Counterclaims (Document

41).

## I.   Background

State Auto is a full-service insurer that distributes its products through independent

agents and offers a wide array of personal and commercial insurance products. (Compl. ¶ 10;

Answer ¶ 10.) State Auto sells its insurance products through independent insurance agents

rather than selling directly to consumers. According to State Auto, it has used a stylized "SA"

logo (the "State Auto Logo") continuously since at least as early as 1981. (Answer ¶ 23.) State

Auto asserts that it has a valid and subsisting Ohio service mark registration for the State Auto Logo, Ohio Registration No. SM4219, for insurance and financial services. (Answer ¶ 22.)

Safe Auto asserts that it is a "consumer-direct personal auto insurer operating in numerous states," and "specializes in selling motor vehicle liability insurance policies tailored to satisfy the mandated coverage requirements of the various state financial responsibility laws for drivers." (Compl. ¶ 6.) Safe Auto alleges that its sole channel of distribution is in-bound sales calls which are generated by marketing directly to the public and are serviced by Safe Auto's in-house staff. (*Id.*) According to Safe Auto, it developed a stylized "SA" logo (different from the State Auto Logo) and variations (collectively, the "Safe Auto Logo") in the fall of 2006. (Compl. ¶ 8.)

Safe Auto states that it filed applications on November 3, 2006 with the United States Patent and Trademark Office ("PTO") to register the Safe Auto Logo. (Compl. ¶ 9.) On December 5, 2006, State Auto filed an application with the PTO to register the State Auto Logo. (Compl. ¶ 11; Answer ¶ 11.) The PTO published the applications for the Safe Auto Logo on June 5 and June 26, 2007, and published the application for the State Auto Logo on June 26, 2007. (Compl. ¶ 13; Answer ¶ 13.)

On or about October 3, 2007, State Auto filed a Notice of Opposition with the Trademark Trial and Appeal Board of the PTO seeking to preclude registration of the Safe Auto Logo and alleging that Safe Auto's use of the Safe Auto Logo "is likely to cause confusion, or to cause mistake, or to deceive, particularly as to the source or origin of the services with which [Safe Auto] intends to use its mark." (Compl. ¶ 14; Answer ¶ 14.)

Plaintiff filed this lawsuit on October 26, 2007. Plaintiff seeks declaratory judgment declaring, for Count I, that "Safe Auto has not infringed any trademark, service mark and/or

other proprietary rights of State Auto"; and for Count II, that "State Auto has abandoned any trademark, service mark and/or other proprietary rights that it possessed in the logo, if any" and that "State Auto has no enforceable trademark, service mark and/or other proprietary rights in that logo." (Compl. ¶ 6–20.) Defendant filed four counterclaims: Counterclaim I for common law trademark infringement, Counterclaim II for false designation of origin under the Lanham Act, Counterclaim III for deceptive trade practices under Ohio law, and Counterclaim IV for Ohio trademark infringement. (Answer ¶ 40–67.)

Plaintiff has moved for summary judgment on Count I and on Defendant's counterclaims; Defendant has moved for summary judgment on Counts I and II and on its counterclaims. Plaintiff has also filed a motion to strike the consumer survey report of Defendant's expert as well as certain alleged hearsay.

## II.    Plaintiff's Motion to Strike

In its motion to strike, Plaintiff moves the Court to strike or exclude from consideration Exhibit 26 to Defendant's Motion for Summary Judgment, hereinafter referred to the "Simonson Survey" or the "Survey," as well as the alleged facts set forth in paragraphs 1–6, 50–53, 56, and 60 of the Statement of Undisputed Facts in State Auto's Motion for Summary Judgment on the ground that it is hearsay. (Mot. Strike 1.)

### A.    Simonson Survey

Plaintiff moves the Court to strike or exclude from consideration the Simonson Survey on the grounds that "the survey is so flawed and lacks reliability as to be irrelevant and/or that any probative value is outweighed by the prejudice it will cause." (Mot. Strike 1.) To be admissible, a survey should generally satisfy the following requirements:

> (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed

3

in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the process was assured.

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007) (quoting *Consumers Union of United States, Inc. v. New Regina Corp.*, 664 F. Supp. 753, 769 n.19 (S.D.N.Y. 1987)).

"Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility." *Leelanau*, 452 F. Supp. 2d at 778 (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004); *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156; *Adjusters Int'l, Inc. v. Pub. Adjusters Int'l, Inc.*, No. 92-CV-1426, 1996 U.S. Dist. Lexis 12604, at *11 (N.D.N.Y. Aug. 27, 1996)). "There are limits, however. The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial." *Leelanau*, 452 F. Supp. 2d at 778–79 (quoting *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000); *Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-cv-5203, 2005 U.S. Dist. Lexis 42541, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005)).

Plaintiff alleges that the Simonson Survey suffers from the following flaws: (i) the Simonson Survey's "combined Eveready-type approach and Squirt-type approach" (Survey 1) is an untested and unaccepted methodology (Mot. Strike 4–8), (ii) the Simonson Survey failed to sample the relevant universe (Mot. Strike 8–11), (iii) the Simonson Survey was improperly leading (Mot. Strike 8–9, 11–14), (iv) the Simonson Survey failed to replicate marketplace

conditions (Mot. Strike 8–9, 14–15), and (v) the Simonson Survey used an improper control (Mot. Strike 8–9, 15–17). Plaintiff contends that, "[a]lthough no one flaw in the Alex Simonson Report may in and of itself mandate exclusion of that report, the combination of flaws renders that report unreliable and irrelevant." (Mot. Strike 17.)

*(i) Combined Eveready and Squirt Approach.* Plaintiff asserts that the Simonson Survey's methodology is untested, unaccepted, and unreliable. The Survey's methodology combined elements of both an *Eveready*-type approach and a *Squirt*-type approach, two approaches that have received court approval. *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976); *Squirt Co. v. Seven-Up Co.*, No. 78-375, 1979 U.S. Dist. Lexis 9986 (E.D. Mo. 1979). Although the Court is "suspicious of methodologies created for the purpose of litigation," *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006), the Court finds that Plaintiff has not shown the Simonson Survey's methodology to be so unreliable that it should be excluded.

*(ii) Sampling the appropriate universe.* To conduct the Simonson Survey, Simonson selected respondents from the universe of "adult males and females 18 years of age and older who are likely to consider purchasing or renewing insurance for a motor vehicle within the next year and . . . will themselves be primarily in charge of choosing the insurance carrier." (Survey 3.) Plaintiff contends that this universe is overbroad because it includes potential customers who would not consider purchasing car insurance directly from the car insurance provider. (Mot. Strike 10.)

Plaintiff compares the Simonson Survey's defined universe to the universe found overly broad in *Leelanau*. In *Leelanau*, the proper universe consisted of potential purchasers of the defendant's wine, which was sold primarily through the defendant's tasting rooms and website.

5

The court found that the survey's defined universe of potential wine purchasers was overbroad where it included those who purchase wine only at grocery or discount retail stores and who did not intend to visit or were unaware of the defendant's tasting rooms or even of wineries in the region. *Leelanau*, 452 F. Supp. 2d at 782.

While this case may be somewhat analogous to *Leelanau*, the Court finds that the defined universe does not call for the Simonson Survey to be excluded, particularly due to the subjective nature of Plaintiff's suggested restriction and the fact that the appropriate universe definition is an issue debated by the experts in this case. (*See* Simonson Decl. Ex. 2 at 7 (Doc. 60-6) (opining that "[t]he universe of the Safe Auto Survey was artificially constrained to those who would 'purchase auto insurance directly from a company without using a broker or an agency'").)

*(iii) Allegedly leading questions.* Plaintiff alleges that the Simonson Survey contains leading questions, primarily due to the use of State Auto's name in the questions. The Court finds that the Simonson Survey's questions did not necessarily suggest a particular answer, and to the extent that the questions may have been leading, the survey's weaknesses will be considered by the factfinder and will go to the weight of the Simonson Survey.

*(iv) Alleged failure to replicate marketplace.* Plaintiff contends that the Simonson Survey did not replicate marketplace conditions when it showed respondents only the Safe Auto Logo over the wording "SafeAuto Insurance." As Defendant points out, however, Safe Auto uses that logo configuration in its advertising, frequently in the absence of any other company-specific information or images. Although it is possible that the Simonson Survey could have better replicated marketplace conditions, the Simonson Survey does shed light on whether the Safe Auto Logo independently contributes to likelihood of confusion.

6

*(v) Allegedly improper control.* Plaintiff asserts that the Simonson Survey used an improper control. Dr. Simonson used the Sentry Insurance "Captain John Parker" logo, which pictures Captain John Parker holding a rifle. (Survey App. G.) Plaintiff contends, and the Court agrees, that the Sentry logo has no similarity to either the Safe Auto Logo or the State Auto Logo, except that it is from an insurance company. However, as Defendant points out, the Simonson Survey's control could plausibly emanate from State Auto and did not contain allegedly infringing elements from the test stimulus. While the control may not be ideal, the Court finds that it is sufficient.

While Plaintiff points out several potential methodological errors in the Simonson Survey, the Court "may choose to limit the importance it accords the study in its likelihood of confusion analysis." *Leelanau*, 502 F.3d at 518–19. The Court finds that the probative value of the survey is not substantially outweighed by the prejudice, waste of time, and confusion it may cause at trial, and therefore will not exclude it. Plaintiff's motion to strike is therefore **DENIED** as to the Simonson Survey.

## B.    Alleged Hearsay

Plaintiff moved the Court to strike or exclude from consideration the statements in paragraphs 1–6, 50–53, 56, and 60 of the Statement of Undisputed Facts in State Auto's Motion for Summary Judgment on the ground that it is hearsay. (Mot. Strike 1.)

Paragraphs 1–6 set forth the history of State Auto as supported by pages of that company's website, authenticated by David DeLong, Manager of Agency Services at State Auto. Safe Auto suggests that Mr. DeLong cannot truthfully verify that he has personal knowledge that the statements on the website are true and correct because some of the events described in those statements took place before Mr. DeLong worked for State Auto. However, "[p]ersonal

7

knowledge . . . does not require contemporaneous knowledge," and "the mere fact that the affiant was not in the employ of a company at the time of specific events does not ipso facto mean that the affiant lacks the personal knowledge required to attest to facts that predate his or her tenure at the company." *Wilton Indus. v. United States*, 493 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2007) (citing 11 Moore's Federal Practice § 56.14[1][c]). Mr. DeLong has averred that he has personal knowledge of the statements, and the Court finds that the statements are admissible.

Paragraphs 50–53, 56, and 60 assert that (a) State Auto has received misdirected phone calls and payments intended for Safe Auto, (b) an email was sent inadvertently to State Auto regarding an audit scheduled to be conducted upon Safe Auto, and (c) "water-cooler" type conversations occur confusing the companies. Citing non-controlling law, Safe Auto contends that such testimony is hearsay (or double-hearsay) as it seeks to offer the statements of alleged callers and/or statements from State Auto employees other than the deponents. State Auto counters that the statements are based on the declarants' first-hand knowledge and are not being offered to prove the truth of the matter asserted, but are merely statements made to establish the original declarants' state of mind (confusion). The Court agrees with State Auto and finds that these statements are admissible. *See* Fed. R. Evid. 803; *Leelanau*, 452 F. Supp. 2d at 786 (holding that such statements are admissible as non-hearsay or under Rule 803(3)); *Barrios v. Am. Thermal Instruments, Inc.*, 712 F. Supp. 611, 618 n.6 (S.D. Oh. 1988).

## III.   Motions for Summary Judgment on Plaintiff's Count I and II and Defendants' Counterclaims I–IV

### A.   Summary Judgment Standard

Both parties have moved for summary judgment under Civil Procedure Rule 56. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

8

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). *See also WSM, Inc. v. Tenn. Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983) (holding that the same summary judgment standard applies to cases of trademark infringement).

### B.  Enforceable Trademark

State Auto seeks summary judgment on Safe Auto's Count II, regarding whether State Auto has an enforceable trademark, service mark, or other proprietary rights in the State Auto Logo; and whether State Auto has abandoned any such rights.

The Lanham Act protects trademarks even if they are not federally registered.[1] *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760–61 (6th Cir. 2005). "Suggestive, arbitrary, and fanciful marks are inherently distinctive and are protectable so long as the putative owner has actually used the mark." *Id.*, 399 F.3d at 761 (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992); *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054–55 (6th Cir. 1999)). As discussed below, the Court finds, and Safe Auto does not dispute, that the State Auto Logo is arbitrary or fanciful. The parties also do not dispute that State Auto has actually used the State Auto Logo; in fact, the record is replete with examples of such use.

---

[1] State Auto asserts that it obtained federal registration for the State Auto Logo but subsequently lost it due to a clerical oversight. (Def.'s Mot. 11.)

9

In Count II of its complaint, Safe Auto contends that State Auto abandoned its logo by failing to exercise adequate control over its use by third parties. Although State Auto moved for summary judgment on this count, neither party has briefed the issue of whether State Auto abandoned the State Auto Logo; therefore, the Court will not now decide whether State Auto has abandoned the State Auto Logo. The Court therefore **DENIES** State Auto's motion for summary judgment on Plaintiff's Count II.

### C.  Law of Trademark Infringement

The Court will now consider the parties' motions for summary judgment on Plaintiff's Count I: Safe Auto's request for declaratory judgment on the question of whether Safe Auto has infringed any trademark, service mark, or other proprietary rights of State Auto. This question of infringement effectively mirrors State Auto's counterclaims for common law trademark infringement, false designation of origin under the Lanham Act, deceptive trade practices under Ohio law, and Ohio trademark infringement. Plaintiff's Count I and all four of Defendant's counterclaims turn primarily on whether a likelihood of confusion exists. 15 U.S.C. § 1125(a)(1)(a) (providing a civil action for false designation of origin where such false designation is likely to cause confusion); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 626 (6th Cir. 2002) ("the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act") (citing *Leventhal & Assocs., Inc. v. Thomson Cent. Ohio*, 714 N.E.2d 418, 423 (Ohio Ct. App. 1998); *Barrios v. American Thermal Instruments, Inc.*, 712 F. Supp. 611, 613–14 (S.D. Ohio 1988)); *Reed Elsevier, Inc. v. TheLaw.net Corp.*, 269 F. Supp. 2d 942, 950–951 (S.D. Ohio 2003) (holding that "[t]rademark claims brought under Ohio Rev. Code 1329.65 or the common law of Ohio are generally analyzed under the same

framework. . . . The key inquiry is whether there is a likelihood for confusion"; deceptive trade practice claims under Ohio Rev. Code § 4165.02 also turn on "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties") (citing *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 288 (6th Cir. 1997); *Coca-Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 29 (6th Cir. 1987); *Rock and Roll Hall of Fame and Museum Inc. v. Gentile Productions*, 934 F. Supp. 868, 872 (N.D. Ohio 1996), *vacated on other grounds*, 134 F.3d 749 (6th Cir. 1998)); *see also Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 (9th Cir. 1981) (noting that state law governs an allegation of common law trademark infringement because there is no such federal common law) (citing *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 915 (9th Cir. 1980)).

To determine whether there is a likelihood of confusion, the Court considers the following factors (the "*Frisch's* factors"): "(1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark." *Audi AG v. D'Amato*, 469 F.3d 534, 542–43 (6th Cir. 2006) (citing *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186–90 (6th Cir. 1988); *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982)). These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil*, 839 F. 2d at 1186. "Not all of these factors will be relevant in every case, and in the course of applying them, 'the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Therma-Scan, Inc. v. Thermoscan,*

*Inc.*, 295 F.3d 623, 630 (6th Cir. 2002) (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)).

"The determination of whether a likelihood of confusion exists is a mixed question of fact and law." *Therma-Scan*, 295 F.3d at 630 (citing *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998)). While any dispute about the evidence pertaining to the *Frisch's* factors presents a factual issue, the "determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Therma-Scan*, 295 F.3d at 630 (citing *Data Concepts*, 150 F.3d at 624; *Homeowners*, 931 F.2d at 1107).

To resist summary judgment on the issue of likelihood of confusion, "a nonmoving party must establish . . . that there are genuine factual disputes concerning those of the *Frisch's* factors which may be material in the context of the specific case." *Homeowners*, 931 F. 2d at 1107. "In examining the record to determine whether a genuine issue of material fact exists, a court must review all evidence in the light most favorable to the nonmoving party." *Id.*, 931 F. 2d at 1107 (citing *Liberty Lobby*, 477 U.S. at 255).

### D.   Analysis of the *Frisch's* Factors

The Court must determine whether there is a genuine question of material fact concerning those *Frisch's* factors which may be material in the context of this case.

#### *(1) Strength of plaintiff's mark*

"This factor focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan*, 295 F.3d at 631 (citing *Homeowners*, 931 F.2d at 1107; *Daddy's Junky Music Stores*, 109 F.3d at 280). "Generally, the strength of a mark is the result of its unique nature, its owner's intensive advertising efforts, or both." *Id.*, 295 F.3d at 631 (citing *Daddy's Junky Music Stores*, 109 F.3d at 280). "A trademark's distinctiveness and resulting strength also

12

[depend] partly upon which of four categories it occupies: 'generic, descriptive, suggestive, and fanciful or arbitrary.'" *Id.*, 295 F.3d at 631 (citing *Daddy's Junky Music Stores*, 109 F.3d at 280).

"[A]n arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Daddy's Junky Music Stores*, 109 F.3d at 280–81 (internal quotation marks and citations omitted). A fanciful or arbitrary mark represents the far extreme on "a spectrum of increasing strength" among the categories; however, "[e]ven an arbitrary trademark is not a strong mark . . . if it does not achieve broad public recognition across product lines." *Therma-Scan*, 295 F.3d at 631 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 280–81; *Homeowners*, 931 F.2d at 1107).

The Court agrees with State Auto, and Safe Auto does not dispute (Pl. Mem. Contra 20), that the State Auto Logo is arbitrary or fanciful because the combination of the letters "S" and "A" have no recognized meaning in everyday speech, nor do they have any inherent connection with the sale of insurance services. *See Daddy's Junky Music Stores*, 109 F.3d at 281.

State Auto also asserts that its logo enjoys broad public recognition, citing its advertising activities and the initial recognition rate in the Simonson Survey. State Auto presented evidence that it spent over $8 million on advertising between 2001 and 2007 and that it uses the State Auto Logo in various media including the State Auto website, billboards, television, newspapers, magazines, and sporting event sponsorships in 33 states. (Def. Mot. Exs. 8; Ex. 4, Harper Dep. 31.) The Sixth Circuit has noted that "evidence of advertising budgets . . . has an attenuated link to actual market recognition." *Homeowners*, 931 F.2d at 1108.

State Auto also points out that the Simonson Survey showed that the company name,

"State Auto," enjoys an initial recognition rate of approximately 50% out of 407 survey

respondents in eight cities in Pennsylvania, Ohio, Kentucky, Indiana. (Simonson Survey at 4, 8,

9.) The Simonson Survey did not, however, measure public recognition of the State Auto Logo,

but rather provided a measure only of name recognition. (Simonson Survey; Simonson Dep. 7.)

Representatives of State Auto have acknowledged that State Auto's name recognition has

been weaker than desired. Robert Restrepo, State Auto's Chairman, Chief Executive Officer,

and President, testified as follows:

> I interviewed the top 50 people in the company, . . . had road shows where I
> visited all of our regional operations, had telephone calls and separate meetings
> with a wide array of agents that I represented. And in the process of conducting
> those interviews and discussions one of the areas of frustration that I heard from a
> variety of folks . . . was our lack of name recognition.

(Restrepo Dep. 13.) When asked about his perception of the recognition of the State Auto brand

at the time that he joined State Auto, he replied:

> I felt that within the industry it was very well known, very well respected. And by
> "the industry" I mean companies doing business in the Midwest in our space,
> property and casualty, and companies wanting to do business. We were also very
> well recognized by independent agents and the independent agency associations
> as being a very well-respected regional company.
>
> . . .
>
> But the frustration was that it wasn't as well known or was very—had a very poor
> name recognition outside of the industry, both the agents as well as the
> companies.
>
> [Question]    So your perception at the time that you joined of the recognition of
> the State Auto brand to the end consumer was that it was not very well known at
> that point?
>
> [Answer]    That's correct.

(Restrepo Dep. 15–16.) Consistent with Mr. Restrepo's testimony, the Sixth Circuit has found

that "the fact that [the plaintiff] deals strictly with real estate brokers suggests that any

recognition that [the plaintiff's] marks have may be limited to the narrow universe of real estate

14

brokers and salespeople who purchase specialized commercial products from [the plaintiff]." *Homeowners*, 931 F.2d at 1108. The same analysis that the Sixth Circuit applied to real estate brokers also applies to insurance agents.

The Court finds that there is no genuine question of material fact as to the strength of the State Auto Logo. While State Auto has presented evidence of public recognition of its name, it has presented no non-attenuated evidence of broad public recognition of its logo; therefore, the Court finds that the State Auto Logo is relatively weak.

### (2) Relatedness of the goods

The relatedness inquiry does not require direct competition, but rather focuses on whether the goods or services are marketed and consumed in a manner that is conducive to consumer confusion.

In *Homeowners*, the plaintiff offered marketing services for commission-based real estate brokers, and the defendant was a non-commission (flat fee) real estate broker. *Homeowners*, 931 F.2d at 1108. The district court found that both parties operated in the area of real estate brokerage and that the defendant directly competed with the plaintiff's customers. *Id.*, 931 F.2d at 1108. The Sixth Circuit found that, while the district court's findings were "literally true," "the relatedness inquiry is not so superficial as the District Court's [findings] impl[y]." The Court first noted that there are three general categories of cases with respect to relatedness of the goods: (1) cases with "direct competition of services, in which case confusion is likely if the marks are sufficiently similar"; (2) cases in which "services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors"; and (3) cases in which "services are totally unrelated, in which case confusion is unlikely." *Id.*,

931 F.2d at 1108 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)). The

Court suggested that the *Homeowners* case may have fit the second description, finding that:

> The companies operate at different levels in the broad real estate industry and sell
> to two completely distinct sets of buyers. While Homeowners and Specialists are
> not competitors, neither can it be said that their services are totally unrelated since
> both companies participate in the real estate industry. However, services are
> "related" not because they coexist in the same broad industry, but are "related" if
> the services are marketed and consumed such that buyers are likely to believe that
> the services, similarly marked, come from the same source, or are somehow
> connected with or sponsored by a common company.

*Homeowners*, 931 F.2d at 1109 (emphasis added).

To the extent that Safe Auto and State Auto compete with each other—consumers may

choose to purchase car insurance directly or through an agent—the Court finds that the parties fit

the first description, as direct competitors. To the extent that the parties do not compete with

each other due to different channels and target markets, the Court finds that the parties generally

fit the second description, as suggested by the Sixth Circuit in *Homeowners*. The relevant

question is whether "the services are marketed and consumed such that buyers are likely to

believe that the services, similarly marked, come from the same source, or are somehow

connected with or sponsored by a common company." *Homeowners*, 931 F.2d at 1109.

Assuming that the services were similarly marked, the Court finds that the services are marketed

and consumed such that buyers would be likely to believe that they are somehow connected.

The services are therefore related.

### (3) Similarity of the marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores*,

109 F.3d at 283 (citing *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1119 (6th

Cir. 1996)). "When analyzing similarity, courts should examine the pronunciation, appearance,

and verbal translation of conflicting marks." *Id.*, 109 F.3d at 283 (citing *Wynn Oil*, 839 F.2d at

1188). The Court should not, however, conduct "a simple side-by-side comparison of the trademarks in question"; rather, "the relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." *Id.*, 109 F.3d at 283; *Therma-Scan*, 295 F.3d at 633. Therefore, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Therma-Scan*, 295 F.3d at 633 (citing *Homeowners*, 931 F.2d at 1109; quoting *Daddy's Junky Music Stores*, 109 F.3d at 283).

Focusing on the overall impression of the Safe Auto Logo and the State Auto Logo, the Court is inclined to find that they are only slightly similar. Both marks incorporate the letters "S" and "A," and have no other imagery, except that Safe Auto asserts that the negative space in its logo is in the shape of a rear-view mirror. While the Safe Auto Logo clearly constitutes a separate "S" and "A," those two letters overlap in the State Auto Logo. In fact, in the absence of the company name, one could reasonably believe that State Auto's logo consisted of only a stylized "A," or even fail to recognize any letters at all in the State Auto Logo. While the Court is inclined to believe that the marks are dissimilar, it finds that a reasonable factfinder could conclude that the Safe Auto Logo, when viewed alone, could lead to uncertainty about the services that it identifies. There is therefore a genuine question of material fact concerning the similarity of the marks.

### (4) Evidence of actual confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 283 (citing *Wynn Oil*, 839 F.2d at 1188). State Auto has presented evidence of actual confusion both before and after the introduction of the Safe Auto Logo; however, it has not presented any evidence suggesting that such confusion is a result of the Safe Auto Logo rather than the parties' very similar names. Safe Auto, on the

other hand, has presented a survey concluding that "there is 0% likelihood of confusion between Safe Auto and State Auto due to the use of the initials "SA" in the [Safe Auto Logo]." (McCullough Report 3 (Doc. 33-1).) State Auto's expert, Dr. Simonson, presents several criticisms of the survey and opines that the "the actual percentage of those confused [in the McCullough survey] was 31% and we cannot determine what percentage of these was indeed not due to the SA logo." (Simonson Decl. Ex. 2 at 28 (Doc. 60-6).) Because neither party has introduced non-expert evidence of actual confusion attributed to the Safe Auto Logo, the only evidence of such confusion is that presented by competing experts. "[W]ithout more evidence to support either [party's] position, the conflicting opinions of the experts [indicate] that questions of fact remain." *Tex. Gas Transmission, LLC v. Butler County Bd. of Comm'rs*, No. 1:06-cv-440, 2007 U.S. Dist. Lexis 91297, *18 (S.D. Oh. Dec. 12, 2007).

### (5) *Marketing channels used*

For this factor, courts conduct an "analysis of the parties' predominant customers" and consider the parties' respective marketing channels to determine "how and to whom the respective goods or services of the parties are sold," as "[t]here is less likelihood of confusion where the goods are sold through different avenues." *Therma-Scan*, 295 F.3d at 636; *Leelanau*, 502 F.3d at 519 (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)).

Safe Auto markets and sells directly to consumers. State Auto markets to independent agents and consumers but sells only through independent agents. According to State Auto's filings with the Securities and Exchange Commission, it considers independent insurance agents to be its primary customers. (*See* State Auto 2004 Annual Report at 4 (Doc. 40-11) ("Because independent insurance agents significantly influence which insurance company their customers

select, management views the Company's independent insurance agents as its primary customers.").) Moreover, Safe Auto contends that the parties cater to very different types of customers, with Safe Auto selling insurance primarily to "economically challenged" customers and relatively high-risk drivers.

On the other hand, both parties engage in marketing activities directed toward the general population of car insurance purchasers. Moreover, State Auto offers a state-minimum "non-standard" type of car insurance similar to that offered by Safe Auto, presumably serving customers similar to those of Safe Auto (and presumably competing directly with Safe Auto).

While there is some overlap in the parties' marketing channels, the Court finds that they are significantly different.

### (6) Degree of purchaser care

In assessing the likelihood of confusion to the public, courts generally use the standard of the typical buyer exercising ordinary caution. *Homeowners*, 931 F.2d at 1111. "However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper," although purchaser expertise "does not necessarily preclude a finding that confusion is likely." *Id.*, 931 F.2d at 1111. "Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion." *Id.*, 931 F.2d at 1111.

To the extent that State Auto's decision-making customers are independent insurance agents, analogous to the "sophisticated commercial buyers who are purchasing business services or services for resale in the course of their business" in *Homeowners*, the likelihood of confusion is lower. *See Homeowners*, 931 F.2d at 1111. To the extent that end consumers make the

decision to purchase State Auto insurance, that company's customers are not sophisticated. Because car insurance is an expensive purchase, however, such customers are likely to exercise greater care in their purchases, decreasing the likelihood of confusion. *See id.*, 931 F.2d at 1111.

### (7) Defendant's intent in selecting the mark

Safe Auto asserts that it created its logo in good faith, explaining that "the people at Safe Auto involved with the selection of the Safe Auto logo did not know [State Auto] even had a logo." (Pl.'s Mot. 37.) State Auto counters that "the Chairman and President of Safe Auto have known of State Auto since the early 1980s, in part because they both drove past State Auto's corporate headquarters regularly." (Def.'s Mot. 19.) The only other evidence that State Auto presents to suggest that Safe Auto had knowledge of the State Auto Logo is Safe Auto's failure to consult a trademark attorney or conduct a clearance search before adopting the Safe Auto Logo, a failure which State Auto contends is "indicative of an intent to remain willfully ignorant" of the State Auto Logo. (Diamond Dep. 39 (Doc. 43-15); Def.'s Mem. Contra Pl.'s Mot. Monetary Counterclaims 7.) The Court finds that State Auto has presented insufficient evidence to create a genuine question of material fact as to Safe Auto's intent.

### (8) Likelihood of expansion

Safe Auto admits that it has considered expanding its insurance offerings to higher levels of liability coverage and to non-automobile applications such as insurance for motorcycle owners and apartment renters, but asserts that "it has not decided anything yet." (Capalino Dep. 149–50; Diamond Dep. 16; Pl.'s Mot. 38.) Although Safe Auto downplays the likelihood of expansion, the Court finds that the company likely plans such expansion.

In conclusion, having considered each of the *Frisch's* factors, the Court finds the following: (1) the State Auto Logo is relatively weak, a factor weighing in favor of Safe Auto;

(2) the services are related, a factor weighing in favor of State Auto; (3) there is a genuine question of material fact concerning the similarity of the marks, "a factor of considerable weight"; (4) there is a genuine question of material fact as to whether actual confusion has occurred; (5) while the parties' marketing channels overlap to an extent, they are significantly different, a factor weighing in favor of Safe Auto; (6) State Auto's customers are either highly sophisticated, or they are likely to exercise greater than ordinary care in their purchases, a factor weighing in favor of Safe Auto; (7) there is no direct evidence of Safe Auto's intent to create a logo similar to the State Auto Logo, a factor weighing in favor of Safe Auto; and (8) Safe Auto likely plans expansion into higher levels of liability coverage and non-automobile applications, a factor weighing in favor of State Auto. While several of the factors point in opposing directions, the Court finds there is a genuine question of material fact concerning at least one significantly material factor: similarity of the marks. Because likelihood of confusion is crucial to Plaintiff's Count I and Defendants' counterclaims, both parties' motions for summary judgment on Plaintiff's Counts I and II and Defendant's Counterclaims I–IV must be **DENIED**.

## IV.    Motion for Summary Judgment on Defendant's Monetary Counterclaim

Plaintiff has moved for summary judgment on Defendant's request for "all damages suffered and/or recoverable as a result of Plaintiff's acts." (Pl.'s Mot. 1; Answer 8.) Because the Court has denied both parties' motions for summary judgment, the Court finds that the issue of damages is not ripe for decision. The Court therefore **DENIES** without prejudice Plaintiff's motion as to Defendant's monetary counterclaims.

## V.    Conclusion

For the reasons discussed above, the Court **DENIES** Plaintiff's Motion to Strike (Document 57); **DENIES** the parties' motions for summary judgment on Plaintiff's Counts I and

II and Defendants' Counterclaims I–IV (Documents 40 and 43), and **DENIES** without prejudice Plaintiff's Motion for Summary Judgment on Defendant's Monetary Counterclaims (Document 41).

> **IT IS SO ORDERED.**

9-29-2009

**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**